******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ALBERTO RIOS
(AC 36987)

DiPentima, C. J., and Prescott and Gruendel, Js.

*Argued September 19, 2016—officially released February 28, 2017*

(Appeal from Superior Court, judicial district of
Fairfield, Kahn, J.)

*Mary A. Beattie*, assigned counsel, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Pamela J. Esposito*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Alberto Rios, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), assault in the second degree in violation of General Statutes § 53a-60 (a) (2), and three counts of reckless endangerment in the first degree in violation of General Statutes § 53a-63 (a).[1] On appeal, the defendant claims that (1) the trial court improperly denied his motion to set aside the verdict and for a new trial because the jury's verdict on several counts was legally inconsistent, and he was not afforded sufficient notice of the charges brought against him, (2) the trial court improperly permitted the state to question the defendant about the credibility of another witness and the defendant's tattoos, (3) the trial court improperly instructed the jury regarding the scope of his duty to retreat before engaging in self-defense, (4) prosecutorial improprieties during the trial deprived him of due process, and (5) this court should exercise its supervisory authority over the administration of justice and order a new trial because of the prosecutor's alleged pattern of improper conduct in this case and other cases. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. During the spring of 2013, Edwin Nunez lived with his girlfriend, Jessica Sanchez (Jessica), in her apartment near the corner of Washington Avenue and Coleman Street in Bridgeport. Jessica and her sister, Erica Sanchez (Erica), had known the defendant since childhood, and Erica and the defendant had previously dated. The defendant lived on Olive Street in Bridgeport. The defendant lived in the same neighborhood as Lucy Lucasio, the mother of Jessica and Erica, who knew the defendant because he had dated Erica.

On April 22, 2013, the defendant sent Nunez a threatening message via Facebook. Prior to receiving this message, Nunez did not know the defendant. Although the message did not contain the defendant's name, the message was accompanied by a photograph of the defendant. In the message and in subsequent messages between Nunez and the defendant, the defendant threatened to harm Nunez and indicated that he previously had assaulted Erica and members of her family, had set Lucasio's house on fire, and had accused Erica of cheating on him.

Nunez asked Erica about the messages, and she identified the defendant as the true sender of them. Nunez also was aware that there was "bad blood" between Erica's family and the defendant. As a result of these messages, which also disparaged Jessica, Nunez concluded that he had to "stick up" for Jessica and wanted to call the defendant's "bluff." Accordingly, he arranged to meet the defendant near the corner of Washington

Avenue and Coleman Street, but did not take the defendant's threats seriously because, in his view, people often "say stuff on the Internet, and they don't mean it." Shortly before going outside to meet the defendant, Nunez received a call from Erica in which she indicated that she had just received a threat from the defendant.

Nunez left his apartment in the middle of the day to meet the defendant at the street corner, but did not take a weapon with him. Nunez observed the defendant, alone in his vehicle, drive by him, after which Nunez immediately received a Facebook message on his phone from the defendant, asking him: "What are you doing out in the open? I like to get away with crime." Shortly thereafter, Jessica joined Nunez outside on the sidewalk near Washington Avenue.

Five or ten minutes later, the defendant returned in his vehicle, this time accompanied by a passenger who was later identified as Robert McDougall. Although Nunez had temporarily turned his back to the street, Jessica observed the defendant accelerate his car toward them. The defendant drove the vehicle directly at Nunez and Jessica while accelerating, striking them both. Nunez was propelled onto the hood of the car, off its windshield, and against a wall. Following the crash, the defendant and McDougall exited the vehicle. McDougall fled the scene, but the defendant immediately approached Nunez, got on top of him, and began punching him in the face. Jessica, who was not as seriously injured as Nunez, pulled the defendant off of Nunez. The defendant left the scene on foot before the police arrived.

Both Jessica and Nunez were taken to the hospital. Jessica received four stiches to mend a laceration on her lip. Nunez had surgery to repair a broken arm and leg, and never fully regained mobility in his arm and leg due to the serious trauma to his limbs.

The defendant was arrested and ultimately charged in a five count amended information as follows. In count one, the defendant was charged with assault in the first degree by using his motor vehicle, a dangerous instrument, to strike Nunez with the intent to cause serious physical injury to him in violation of § 53a-59 (a) (1). In count two, the defendant was charged with assault in the second degree arising from the same conduct as alleged in count one, the difference being that, with the intent to cause serious physical injuries to Nunez, he caused serious physical injury to Jessica in violation of § 53a-60 (a) (2). In counts three, four, and five, the defendant was charged with reckless endangerment in the first degree for engaging in unspecified reckless conduct with extreme indifference to human life, which created a risk of serious injury to Jessica, Nunez, and McDougall, respectively, in violation of § 53a-63 (a).

At trial, the defendant testified that he drove toward Nunez in self-defense. He asserted that it had been Nunez who had threatened him, and that, as he approached Nunez and Jessica, he observed Nunez reaching into his coat toward his waistband for what he believed was a gun. The defendant testified that he believed that he was going to "get shot" and that he instinctively attempted to protect himself by driving the car toward Nunez.

The jury returned a verdict of guilty on all five counts.[2] This appeal followed. Additional facts and procedural history will be set forth later as necessary to address the specific claims of the defendant.

I

The defendant first claims that the court improperly denied his motion to set aside the verdict and for a new trial. The defendant's claim on appeal is twofold. First, he argues that the verdict on counts one, two, and four is legally inconsistent. Specifically, the defendant argues that the jury's necessary conclusion that he had engaged in an intentional assault of Nunez and Jessica as charged in counts one and two, is legally inconsistent with its conclusion that he recklessly engaged in conduct that created a risk of serious physical injury to Nunez, as charged in count four of the amended information. In response, the state argues that the verdict is not legally inconsistent because a "plausible theory" exists under which the jury reasonably could have found the defendant guilty of all three offenses. The state's "plausible theory" is that the defendant's conviction on counts one and two was based on his conduct in steering his automobile directly into Nunez and Jessica, whereas his conviction on count four was based upon his postcrash conduct during which the defendant exited the vehicle and proceeded to punch Nunez in the face while he lay on the ground already seriously injured.

Second, the defendant argues on appeal that he lacked constitutionally sufficient notice of the charges of which he could be convicted because the state's theory of the case at trial was never that he acted recklessly in harming the victims but, instead, that he was on a "hunting mission" and intended to assault Nunez. The state counters that its theory of the case was not limited to the defendant's intentional assault but, instead, included a theory that the defendant, after he had intentionally assaulted Nunez and Jessica, recklessly engaged in conduct that created a risk of serious harm to Nunez by exiting his vehicle and punching Nunez. For the reasons subsequently set forth, we disagree with the defendant's assertions.

The following facts and procedural history are relevant to these claims. At trial, the state called Nunez to testify, and he described the defendant's conduct prior

to and after the defendant crashed into him and Jessica with his vehicle. Specifically, Nunez testified that he was "flipped over" by a speeding vehicle driven by the defendant and "landed near the building" he was standing by with Jessica. After Nunez landed, he heard Jessica "screaming" and then witnessed the defendant approach him. Nunez stated that the defendant got on top of him and struck him with his fists while he lay seriously injured from being struck by the defendant's vehicle. In addition to Nunez' testimony, other evidence was introduced that described the defendant's post-crash conduct, including the testimony of Jan Zolotov, an eyewitness, who described the event in similar terms.[3]

Following the conclusion of trial, the defendant filed a motion to set aside the verdict and for a new trial. In support of his motion, the defendant argued that the verdict on counts one and two required proof of a mental state legally inconsistent with that required to find him guilty on count four. Specifically, the defendant argued that his conviction under counts one and two is legally inconsistent with the conviction under count four because the first two counts required the jury to conclude that his conscious objective was to cause serious physical injury to Nunez, while count four required the jury to conclude that the defendant recklessly engaged in conduct that created a risk of serious physical injury to Nunez. To support his inconsistent verdict claim, the defendant argued that the state's theory of the case was that he was on a "hunting mission" and that the evidence presented at trial tended to show only that he intended to cause serious physical injury to Nunez.

In response, the state argued that the jury plausibly could have found that the defendant possessed distinct mental states before and after the vehicle crash. Specifically, the state argued that the jury could have found that the defendant intended to cause serious physical injury to Nunez when the defendant drove his vehicle into Nunez, and that the defendant was reckless in creating a risk of serious physical injury to Nunez when the defendant exited the vehicle after the crash and began striking Nunez with his fists. Additionally, the state claimed that the prosecutor "never argued a factual basis for [first degree] reckless endangerment" and that the jury was "free" to come to such conclusions on the basis of the "evidence available" to it.

On May 15, 2014, the trial court denied the defendant's motion to set aside the verdict and for a new trial. The court agreed with the state that the evidence introduced at trial supported a "rational theory" of both intentional assault and reckless endangerment, and that the defendant reasonably could have possessed "different mental states as to different results." The court pointed to the defendant's testimony that after he crashed into Nunez,

he exited his vehicle, jumped on Nunez, and struck him with his fists, disregarding the serious physical injuries that Nunez had already suffered.

Before turning to the merits of the defendant's claims on appeal, it is important to review some recent developments in the law of inconsistent verdicts and to discuss how the timing of these developments affected the defendant's presentation of his claim to the trial court that the verdict as to certain of the counts in this case was legally inconsistent.

At the time the defendant moved to set aside the verdict on the ground that it was legally inconsistent, he relied heavily upon this court's decision in *State* v. *King*, 149 Conn. App. 361, 87 A.3d 1193 (2014), rev'd, 321 Conn. 135, 136 A.3d 1210 (2016). In *King*, the defendant was tried on two counts of assault in the first degree in violation of § 53a-59 (a) (1) and (3). *State* v. *King*, 321 Conn. 135, 137, 136 A.3d 1210 (2016). The first count alleged that the defendant intentionally had stabbed the victim. Id., 137–39. The second count alleged that he recklessly engaged in conduct under circumstances evincing an extreme indifference to human life and thereby caused serious physical injuries to the victim. Id.

At trial, the jury in *King* was presented with evidence regarding the underlying criminal conduct that occurred in two phases. Id., 142. The jury first heard evidence of a dispute between the defendant and Kyle Neri over an unpaid loan at the victim's home. Id., 138, 142–43. As the dispute escalated, the defendant grabbed a knife and began swinging it at Neri. Id., 138, 143. The victim intervened in the dispute and attempted to remove the knife from the defendant's grasp, but was struck by the knife and injured. Id., 139. Later, the jury was presented with an account of the defendant's subsequent conduct; id., 143–44; in which the defendant threw the victim up against a wall and stabbed her "at least three times with a steak knife." Id., 144.

The trial court in *King* denied a motion to set aside the verdict on the ground that it was legally inconsistent. Id., 139. The defendant appealed to this court, and we reversed the judgment of conviction on the ground that the verdict was legally inconsistent. *State* v. *King*, supra, 149 Conn. App. 363.

In doing so, this court held that a proper assessment of whether a verdict is legally inconsistent must be conducted in light of the state's theory of the case. Specifically, this court stated that "[i]n determining whether a verdict is legally and logically inconsistent . . . a reviewing court must also consider the way in which the state presented the case to the jury." Id., 371. This court then analyzed the record and concluded that the state pursued the charges against the defendant as alternative theories of liability, that is, as one substan-

tive criminal offense that was committed either recklessly or intentionally. Id., 373. As a result, this court concluded that the judgment of conviction on both counts violated "the defendant's due process rights to fair notice of the charges against him . . . ." Id., 375.

Relying in part on our decision in *King*, the defendant in the present case presented a single claim to the court in his motion to set aside the verdict: The verdict on counts one and two was legally inconsistent with the verdict on count four. That single claim, however, appeared to employ the analytical framework set forth in this court's decision in *King* because it rested, in part, on a subsidiary assertion that the state, by amending the information before trial, had abandoned its reliance upon the defendant's postcrash conduct as a factual basis of guilt and, therefore, should not be permitted to argue on appeal that the verdict was legally consistent because of the defendant's postcrash conduct. In so doing, however, the defendant did not raise a separate claim that his due process right to notice of the charges against him had been violated because he had been convicted of having engaged in conduct with which he had not been charged.

After the defendant filed his principal brief in this court, our Supreme Court reversed this court's decision in *State* v. *King*, supra, 149 Conn. App. 361. See *State* v. *King*, supra, 321 Conn. 148. Specifically, our Supreme Court clarified that a defendant's claim that a verdict is legally inconsistent is conceptually distinct from a claim that the state altered its theory of the case after the verdict; id., 148–49; which is more properly characterized as a separate due process claim. Id. The Supreme Court concluded that these are "ultimately separate issues and reviewing courts should evaluate them as such." Id., 148. The court emphasized that the resolution of a claim that a verdict is legally inconsistent should not be resolved by reference to the state's theory of the case but, instead, by examining the elements of the charges at issue to determine whether there is any plausible view of the evidence that would render the verdict legally consistent. Id., 140–41. Thus, in order to address the defendant's arguments properly in the present case, we separate and analyze the two arguments independently pursuant to the direction of our Supreme Court in *King*.

A

We first turn to whether there was "any plausible theory"; id., 141; under which the jury reasonably could have concluded that the defendant was guilty of all crimes charged under counts one, two, and four without creating a legal inconsistency. The defendant argues that there is no plausible theory under which the jury could have found him guilty of both intentional assault in counts one and two and reckless endangerment in count four because the requisite mental states for those

charges are legally inconsistent, and are based upon the same criminal conduct and result. In response, the state argues that the defendant's conduct gave rise to two separate crimes whereby the defendant acted intentionally and recklessly at different times, and with respect to different results. We agree with the state.

The following legal principles guide our decision. A legally inconsistent conviction exists when "a conviction of one offense requires a finding that negates an essential element of another offense of which the defendant also has been convicted." *State* v. *Nash*, 316 Conn. 651, 659, 114 A.3d 128 (2015). "When confronted with such a claim we carefully examine the elements of both offenses." *State* v. *King*, supra, 321 Conn. 140. "In examining a claim of legal inconsistency, we must closely examine the record to determine whether there is any plausible theory under which the jury reasonably could have found the defendant guilty of both offenses. . . . Additionally, in determining whether two mental states are mutually exclusive, the court must consider each mental state as it relates to the particular result described by the statute." (Citation omitted; internal quotation marks omitted.) Id., 140–41. The determination of whether the defendant's conviction is legally inconsistent is a question of law, over which we exercise plenary review. Id., 141.

Here, the defendant argues that there is no "plausible theory" under which the jury could have found him guilty of both intentional assault and reckless endangerment. Specifically, the defendant argues that his conduct amounted to one continuous act, and that his conviction on counts one, two, and four required the jury to find that he simultaneously acted intentionally and recklessly "with regard to the same victim, the same act, and the same result."

The defendant argues that the facts before us are analogous to those set forth in *State* v. *King*, 216 Conn. 585, 583 A.2d 896 (1990), a 1990 decision of our Supreme Court that is not to be confused with its 2016 decision in *State* v. *King*, supra, 321 Conn. 135. The defendant in *State* v. *King*, supra, 216 Conn. 586, was charged with and found guilty of the crimes of assault in the first degree in violation of § 53a-59 (a) (3), arson in the first degree in violation of General Statutes § 53a-111 (a) (2), and attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a (a). The defendant's conviction arose from an incident that occurred while serving a prison sentence at the Bridgeport Community Correctional Center. Id., 588. In the early morning of June 20, 1988, a fire broke out in one of the cells that caused serious harm to the cell's occupant. Id. It was later discovered that, prior to the fire, the defendant and the victim had been in a dispute, and that the defendant started the fire to harm the victim following that dispute. Id.

Following his conviction, the defendant claimed on appeal that the trial court improperly denied his motion for a new trial because it should not have instructed the jury that it could find him guilty of both attempted murder and assault (reckless) in the first degree. Id., 592. Our Supreme Court agreed, vacating the conviction of assault in the first degree and attempted murder, and ordering a new trial. Id., 603–604.

Our Supreme Court explained that in order for the jury to find the defendant guilty of attempted murder, it must have concluded that the "defendant acted with the intent to cause the death of the victim." (Footnote omitted.) Id., 593. "On the other hand, the jury's verdict of guilty on the count of assault [reckless] necessitated a finding that the defendant acted *recklessly*, and thereby created a risk of death to the victim." (Emphasis in original; footnote omitted.) Id. Our Supreme Court recognized that "[t]o return verdicts of guilty for both attempted murder and assault in the first degree [reckless] . . . the jury would have had to find that the defendant simultaneously acted intentionally and recklessly with regard to the same act and the same result, i.e., the injury to the victim." Id. The defendant's convictions were overturned because "the transgression that caused the victim's injuries was either intentional or reckless; it could not, at one and the same time, be both." Id., 594.

We acknowledge that the defendant before us was convicted of crimes that, like those in *State* v. *King*, supra, 216 Conn. 585, possess mutually exclusive mental states, but disagree that the facts of that case are analogous to those before us. The primary distinction between the present facts and those in *State* v. *King*, supra, 585, is that the jury here was presented with evidence of two separate criminal acts. Although it is undisputed that an individual cannot simultaneously act intentionally and recklessly, that notion is limited to the same criminal conduct and result. See id., 594 (explaining that a single act cannot both be intentional and reckless). The defendant in *King* committed a single criminal act when he started a fire within the cell that caused harm to the victim. Id., 588. The opposite is true here, as the jury reasonably could have concluded that the defendant's conduct amounted to two distinct criminal acts in which he possessed otherwise mutually exclusive mental states.

Instead, the present case is more analogous to the later *King* (2016) decision, the facts of which we have discussed previously. See *State* v. *King*, supra, 321 Conn. 135, the facts of which we have discussed previously. In *King* (2016), our Supreme Court clarified that, under certain circumstances, a jury reasonably could conclude that a criminal defendant can possess otherwise mutually exclusive mental states throughout the course of temporally related but separate criminal

acts. Id., 144. Specifically, the jury in that case could have found that the defendant "was guilty of both crimes by stabbing the victim while recklessly swinging the knife at Neri and then intentionally stabbing the victim after she intervened and the defendant threw her against the wall." Id. Our Supreme Court further reasoned that "a defendant may be convicted of crimes that require differing mental states, so long as those states relate to different criminal results." Id., 145; see also *State* v. *Nash*, supra, 316 Conn. 666 (affirming the defendant's conviction "because the two mental states required to commit the offenses relate to different results").

In the present case, with respect to the defendant's conviction of assault as charged in counts one and two, evidence was presented at trial that sufficiently described a plausible theory whereby the jury reasonably could have concluded that the defendant, who had been seeking to initiate a physical confrontation with Nunez, committed the crimes of (1) assault in the first degree pursuant to § 53a-59 (a) (1)[4] by intentionally striking Nunez with his vehicle with the intent to cause him serious physical injuries; (2) assault in the second degree pursuant to § 53a-60 (a) (2),[5] by causing serious physical injury to Jessica by striking her with his vehicle with the intent to cause serious physical injuries to Nunez; and (3) reckless endangerment in the first degree pursuant to § 53a-63 by exiting his vehicle following the crash and striking an already seriously injured Nunez with his fists, thereby creating a risk of exacerbating those injuries. Even though the defendant's acts here were temporally related, the jury reasonably could have concluded that the defendant was guilty of intentionally assaulting Nunez and Jessica, and reckless endangerment by discrete acts throughout the entire course of conduct described to the jury.

We, therefore, conclude that a plausible theory exists whereby the jury reasonably could have concluded that the defendant's conduct amounted to separate criminal acts. Accordingly, the defendant's conviction of assault and reckless endangerment under counts one, two, and four is not legally inconsistent.

B

We next consider whether the defendant received constitutionally sufficient notice of the charges brought against him. The defendant argues that he was not afforded such notice, in part because the state abandoned charges relating to the defendant's postcrash conduct by amending, on the eve of trial, the original information. Specifically, the defendant argues that the state proceeded at trial solely on a theory that he acted intentionally because he was on a "hunting mission." We disagree.

Before turning to the merits of this claim, we note

that, because the defendant did not raise this due process claim as a separate and distinct claim to the trial court, we arguably are not bound to consider it. Practice Book § 60-5; *Travelers Casualty & Surety Co. of America* v. *Netherlands Ins. Co.*, 312 Conn. 714, 761, 95 A.3d 1031 (2014). In this case, however, we elect to review the defendant's due process claims for several reasons.

First, the defendant presented his inconsistent verdict and due process claims to the trial court as one claim, on the basis of the existing structural framework used by this court in *State* v. *King*, supra, 149 Conn. App. 361. Although that framework was subsequently rejected by our Supreme Court, it would be unfair to penalize the defendant by declining review of his due process claim for structuring it on the basis of applicable law at that time.

Second, although the defendant's due process claim was not raised independently from his inconsistent verdict claim, the essence of the claim actually was presented to and decided by the trial court. Specifically, the trial court understood and rejected the defendant's argument that he somehow lacked notice of the charges against him because the state's theory of the case postverdict was different from the manner in which it was presented to the jury. Accordingly, affording this claim review on appeal will not result in trial by ambuscade or be unfair to the trial court or the opposing party. See *State* v. *Elson*, 311 Conn. 726, 749, 91 A.3d 862 (2014).

Third, although the Supreme Court's decision in *State* v. *King*, supra, 321 Conn. 135, was not released until after the state had filed its appellee brief, the state devoted several pages in its brief to the defendant's argument that the state had altered its theory of the case. Finally, our consideration of this claim is appropriate because we decide it adversely to the defendant, and the state is, therefore, not prejudiced by its review. See *State* v. *Gaines*, 257 Conn. 695, 713 n.13, 778 A.2d 919 (2001).

The following additional facts and procedural history are relevant to the defendant's due process claim. Prior to the eve of trial, the defendant had been charged in an eight count information dated May 16, 2013. The first five counts of the original information were almost identical to the amended information filed on January 26, 2014, upon which the state ultimately proceeded to trial. In the original information, however, count one charged the defendant with assault in the first degree in that the "[defendant], with intent to cause serious physical injury to one Jessica Sanchez, did cause serious physical injury to the said Jessica Sanchez with a dangerous instrument, to wit: a motor vehicle . . . ." In the amended information, the state altered count one to allege a charge of an intentional assault of Nunez and amended count two to allege an assault of Jessica

under a theory of transferred intent, i.e., with the intent to cause serious physical injuries to Nunez, he caused serious physical injury to Jessica.

The original information also contained three additional counts that were deleted from the amended information upon which the case was tried. In count six, the state had charged the defendant with assault in the third degree, alleging that the defendant, with the intent to cause physical injury to Nunez, caused physical injury to Nunez. In count seven, the state had charged the defendant with threatening in the second degree, alleging that the defendant had physically threatened Jessica at or near Washington Avenue and Coleman Street with the intent to place her in fear of imminent serious physical injury. In count eight, the state had charged the defendant with threatening in the second degree, alleging that the defendant had physically threatened Nunez at or near Washington Avenue and Coleman Street with the intent to place him in fear of imminent serious physical injury. The state did not explain at the time it filed the amended information any of its reasons for dropping counts six, seven, and eight. Further, the state did not discuss whether the remaining charges were exclusively applicable to the defendant's conduct in striking Nunez and Jessica with his vehicle.

At the time the state filed its amended information, the court stated that it understood that the state had amended the information to clarify "in count two that it's charging [the defendant] with intent to cause physical injury to Edwin Nunez, [he caused] physical injury to [Jessica], by means of a dangerous weapon." The court proceeded to ask the defendant if he waived a reading of the information and advisement of rights, to which he responded, through his counsel, in the affirmative, and entered pro forma pleas of not guilty.

As noted previously, the defendant moved the court to set aside the verdict and for a new trial following the verdict. The defendant argued in support of that motion that his conscious objective to cause serious physical harm to Nunez as charged in counts one and two was legally inconsistent with the mental state of recklessness required to be convicted under count four. The defendant supported his argument by claiming that all of the charged counts implicated the same criminal conduct and the same victim throughout a nonbifurcated and "fast-moving event." Further, the defendant claimed that the state's theory of the case was that he was on a "hunting mission," and that, collectively, the evidence tended to support only a theory of intentional assault. In response, the state argued that the jury was free to find the defendant guilty on all counts on the basis of the evidence presented at trial and the charges brought against the defendant in the information.

With respect to the defendant's argument that the

state was not pursuing charges relating to the defendant's postcrash conduct, the court asked the following: "[Y]ou're not claiming like the *State* v. *King* [supra, 149 Conn. App. 361] case that your client or you had no notice that the state was pursuing charges that were both intentional and reckless. You're not claiming that in this case, are you?" The court immediately followed that question with a more pointed question, asking whether the defendant and counsel "knew what the charges were," to which defense counsel responded, "[o]f course."

On May 15, 2014, the court denied the defendant's motion. In denying that motion, the court reasoned that the defendant was "well aware that the state was pursuing the different and separate offenses," and that he had sufficient notice of the charges brought against him.

The following principles guide our analyses. "A fundamental tenet of our due process jurisprudence is that [i]t is as much a violation of due process to send an accused to prison following conviction of a charge on which he was *never tried* as it would be to convict him upon a charge that was never made. . . . Accordingly, the United States Supreme Court has explained that [t]o uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process. Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused. . . . Reviewing courts, therefore, cannot affirm a criminal conviction based on a theory of guilt that was never presented to the jury in the underlying trial. . . .

"Principles of due process do not allow the state, on appeal, to rely on a theory of the case that was never presented at trial. . . . Although we recognize that the finder of fact may consider all of the evidence properly before it, in order for us to uphold the state's theory of the case on appeal, that theory must have been not merely before the jury due to an incidental reference, but as part of a coherent theory of guilt that, upon [review of] the principal stages of trial, can be characterized as having been presented in a focused or otherwise cognizable sense. . . . Essentially, the state may not pursue one course of action at trial and later, on appeal, argue that a path [it] rejected should now be open to [it] . . . . To rule otherwise would permit trial by ambuscade. . . . Accordingly, on appeal, the state may not construe evidence adduced at trial to support an entirely different theory of guilt than the one that the state argued at trial. . . . Whether a defendant has received constitutionally sufficient notice of the charges of which he was convicted may be determined by a review of the relevant charging document, the theory on which the case was tried and submitted to

the jury, and the trial court's jury instructions regarding the charges." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *King*, supra, 321 Conn. 148–50.

We first examine the state's amended information upon which the case was tried. It is well established that an information provides notice to the defendant of the charges of which he may be convicted. See *State* v. *James*, 247 Conn. 662, 679, 725 A.2d 316 (1999); *State* v. *Tanzella*, 226 Conn. 601, 608, 628 A.2d 973 (1993); *State* v. *Spigarolo*, 210 Conn. 359, 382, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989); see also Practice Book § 36-13 ("[t]he information shall state for each count the official or customary citation of the statute, rule, regulation, or other provision of law which the defendant is alleged to have violated").

The state's amended information charged the defendant with multiple counts of intentional assault and reckless endangerment, and did not in any way suggest that they represented alternative theories of liability or that the state did not intend to present all charges to the jury for consideration. The amended information contains five separate counts—one for each offense. Nothing in the amended information explicitly or implicitly indicates that the state intended to prosecute count four as an alternative to criminal liability under counts one and two.

Importantly, if the defendant had been unclear of the charges brought against him, nothing precluded him from filing a motion for a bill of particulars pursuant to Practice Book § 41-20. See *State* v. *King*, supra, 321 Conn. 151. Furthermore, if the defendant truly had believed at the time of trial that certain charges had been brought only as alternative theories of guilty, he presumably would have requested an instruction from the court explaining to the jury that it could not find him guilty of reckless endangerment as to Nunez if it concluded that he was guilty of counts one or two.[6] The defendant did not pursue either of these measures to resolve any potential confusion he may have had with respect to the charged offenses. Thus, the state's amended information tends to suggest that the defendant was on notice that count four sought to impose criminal liability on him for conduct that was distinct from counts one and two.

We next examine the evidence that the state introduced at trial. In that regard, it is clear that the state introduced evidence that the defendant intentionally assaulted Nunez by crashing his vehicle into him and Jessica, and also that he subsequently exited his vehicle and engaged in conduct that risked causing further serious physical injury to Nunez. Thus, the state introduced evidence that supported all charges listed in the amended information.

Like in *King* (2016), it is true that the state in the present case did not present its evidence in a manner that necessarily delineated the charges to which specific evidence or testimony related. Our Supreme Court in *King* (2016) recognized, however, that a prosecutor's failure to do so "is not equivalent to a prosecutor who does specify the evidence underlying a charge and then subsequently adopts a different evidentiary justification for that charge." Id., 153. Here, as in *King* (2016), the state did not take any action while presenting its case that would have induced the defendant to refrain from defending against all of the evidence or to believe that the evidence related only to one charge or another. Instead, the state presented evidence of the defendant's entire encounter, which, as previously discussed, evidenced two independent criminal acts.

In determining the state's theory of the case, examination of the state's closing argument is also an important consideration. See id., 154–55. The manner in which the prosecutor conducted the state's closing argument also did not suggest that the state had intended to prosecute any of the charges as alternatives to each other. Unlike the situation in *State* v. *King*, supra, 321 Conn. 155–56, the prosecutor here did not make any statements, ambiguous or otherwise, that could reasonably be construed as framing certain charges in the disjunctive. It is true that the prosecutor spent the bulk of her argument on analyzing the defendant's conduct that formed the bases of the two counts of intentional assault. Indeed, it is likely that the state focused on those charges because they were the most serious charges and the defendant had raised the justification of self-defense arising out of his factual contention that he intentionally had crashed his car into Nunez in order to avoid being shot.

It is not true, however, that the prosecutor ignored the defendant's postcrash conduct or the reckless endangerment charges during her closing argument. During her closing argument, the prosecutor conveyed to the jury that "[t]he other thing you have to conclude is that [the defendant] immediately got out of the car and assaulted Edwin Nunez."[7] If the state was proceeding, as the defendant argues, solely on a theory that he was on a "hunting mission," it would have been unnecessary for the state to prove or for the jury to conclude that he assaulted Nunez after he got out of the car in order to find the defendant guilty on the first two counts of the information.

Finally, the court's charge to the jury supports a conclusion that the defendant had adequate notice that he could be convicted on the first two counts and count four of the information. In its charge to the jury, the court never stated or implied that any of the charges were brought against the defendant in the alternative or that the jury should consider count four only if it

had found the defendant not guilty on counts one and two. Instead, the court charged the jury on all counts contained in the amended information and stated that it was the jury's "duty to consider each count separately in deciding the guilt or nonguilt of the defendant." Importantly, the court stated that "the determination of one count or charge or one part of the charging document does not automatically make the defendant guilty or not guilty of any other count or charge."

Our review of the court's instructions reveals that the court clearly conveyed to the jury that there were five counts listed in the amended information and that the jury was obligated to come to a verdict on each of the five counts. Counsel had the opportunity to object to the court's instructions or request that the court clarify, but did not. Thus, the court's instructions amply suggest that the defendant had notice of all the charges the jury was to consider.

Finally, we address the defendant's argument that he lacked adequate notice of the charges against him because the state, by amending the information on the eve of trial, abandoned counts relating to his postcrash conduct, and, thus, the theory of the case had changed following his conviction. We disagree for two reasons.

First, the defendant's assertion that the state, by withdrawing counts six through eight of the original information, intended to abandon reliance on the defendant's postcrash conduct is speculative at best because it is premised on an assumption that those counts sought to impose criminal liability on the defendant for his postcrash conduct. None of the withdrawn counts, however, explicitly referred to postcrash conduct as the factual basis for the crime alleged therein.

Instead, these counts, similar to counts three through five, merely stated that the defendant committed the crime charged in that specific count by engaging in conduct that constituted the elements of the offenses at the specified date and time at the location of Washington Avenue and Coleman Street. Thus, we are unwilling to infer, as the defendant invites us to do, that the state intended to abandon its reliance on postcrash conduct by withdrawing counts six, seven, and eight because they were vaguely worded and did not explicitly rely on postcrash conduct. Each of these counts could be construed to impose liability on the defendant for unspecified conduct he committed before he exited his vehicle. Indeed, the state may have chosen to withdraw these counts because, in its view, they implicated conduct that was already covered by the remaining charges, or in order to reduce any confusion for the jury regarding what alleged conduct related to which charge.[8]

Second, the state did not provide any reasons as to why it was withdrawing the counts and, thus, did not induce the defendant to believe that it had abandoned

any reliance on his postcrash conduct as a basis for criminal liability in the case. To the extent that the withdrawal of these counts raised such an inference in the defendant's mind, he could have requested that the court require the state to provide its reasons for withdrawing the counts.

Moreover, we disagree with the defendant's assertion in his reply brief that a colloquy between the court and his counsel at the hearing on the defendant's motion to set aside the verdict demonstrates that the state had abandoned, prior to trial, any reliance on his postcrash conduct. During argument, defense counsel stated that his understanding was that "the state had originally charged [the defendant] with assault and threatening for [the] postcrash event. And, as I understood, the state's theory of the case was that the state did not pursue those charges and was not pursuing the events that happened postcrash." The prosecutor did not affirmatively respond to this assertion, but did generally argue that the state had not changed its theory of the case.

The defendant argues that because the state did not affirmatively disagree with defense counsel's statement, the state conceded that it had abandoned prior to trial a theory of liability relating to the defendant's postcrash conduct. We are unwilling to imply such a significant concession from the state's failure to respond to one of the many assertions defense counsel made during argument on the motion to set aside the verdict. The state never affirmatively conveyed that it agreed with defense counsel's assertion and was not given an opportunity to respond to it before the court denied the motion. According, this argument lacks merit.

In sum, after our review of the amended information, the evidence introduced at trial, the state's closing argument, and the court's charge to the jury, we conclude that the defendant had sufficient notice of the charges brought against him, and that he could be convicted of all charged offenses, including for conduct he committed after intentionally crashing his vehicle into Nunez and Jessica. Accordingly, the defendant's due process rights were not violated.

II

The defendant next claims that the trial court made two improper evidentiary rulings. First, he claims that the court improperly allowed the prosecutor to question the defendant on the credibility of another witness. Second, he claims that the court improperly admitted evidence regarding his tattoos. We conclude that the court improperly permitted the state to question the defendant regarding the credibility of another witness. We also assume, without deciding, that the court improperly admitted evidence of the defendant's tat-

toos. Nevertheless, we conclude that neither ruling constituted harmful error.

As a preliminary matter, we set forth our standard of review. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Furthermore, [i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Popeleski*, 291 Conn. 769, 774, 970 A.2d 108 (2009). "Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." (Internal quotation marks omitted.) *State* v. *Abreu*, 106 Conn. App. 278, 283, 941 A.2d 974, cert. denied, 286 Conn. 919, 946 A.2d 1249 (2008).

A

First, the defendant contends that the court improperly permitted the prosecutor to ask the defendant whether another witness had lied when testifying. In response, the state concedes that at least one of the questions that it asked was improper, but argues that the defendant has not satisfied his burden of demonstrating any harmful error. We agree that the defendant has not met his burden to establish harmful error.

The following facts are relevant to our resolution of this claim. Zolotov, an eyewitness, agreed with the prosecutor that Nunez and Jessica were standing "idly" when they were struck by the defendant's car. The defendant later testified that Nunez signaled the defendant, and later motioned toward his waist, for what the defendant believed to be a firearm. The following colloquy occurred between the state and the defendant during its cross-examination of him in which he discussed Zolotov's testimony:

"[The Prosecutor]: And so when Mr. Zolotov sat there and said that they were just standing there when your car came and careened into them, that was incorrect?

"[Defense Counsel]: Objection, Your Honor.

"The Court: Overruled. . . .

"[The Defendant]: Can you please state that again?

"[The Prosecutor]: I said, when Mr. Zolotov, the man

with the Russian accent, you—

"[The Defendant]: Yes.

"[The Prosecutor]: —remember him? So, when he sat there and told this jury that the two people on the corner were minding their own business and your car came and crashed into them, that was incorrect?

"[The Defendant]: That he also said that he saw my car speed up, so, obviously, when—

"[The Prosecutor]: No, sir. Sir—

"[The Defendant]: —he saw my car, his eyes were not on the two people.

"[The Prosecutor]: Sir, was it incorrect?

"[The Defendant]: Yes, it was incorrect.

"[The Prosecutor]: So, do you believe that he purposefully sat there and mischaracterized the event?

"[The Defendant]: I believe he was mistaken."

It is well established that questions seeking a witness' opinion regarding the veracity of another witness are barred. *State* v. *Singh*, 259 Conn. 693, 706, 793 A.2d 226 (2002). The underlying basis for such a rule is to prohibit a fact witness from invading the jury's exclusive function to determine the credibility of witnesses. Id., 707. "[Q]uestions of this sort . . . create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied." Id., 708. This prohibition includes questions that ask whether another witness is lying, mistaken, wrong, or incorrect. Id., 712. We turn then to whether the defendant has established that he was harmed by this colloquy between the prosecutor and the defendant.[9]

"[T]he proper standard for determining whether an erroneous evidentiary ruling is harmless [is] whether the jury's verdict was substantially swayed by the error. . . . In applying this standard, which expressly requires the reviewing court to consider the effect of the erroneous ruling on the jury's decision, an appellate court may conclude that a nonconstitutional error is harmless only when it has a fair assurance that the error did not substantially affect the verdict. . . . In reviewing the case, we consider a number of factors, namely, the overall strength of the state's case, the impact of the improperly admitted or excluded evidence on the trier of fact . . . and the presence of other evidence corroborating or contradicting the point for which the evidence was offered." (Citations omitted; internal quotation marks omitted.) *State* v. *Calabrese*, 279 Conn. 393, 411–12, 902 A.2d 1044 (2006). It is the defendant's burden to show that any errors were harmful. *State* v. *Eleck*, 314 Conn. 123, 129, 100 A.3d 817 (2014).

Our Supreme Court "has never had a case in which a *Singh* violation, standing alone, was deemed suffi-

ciently egregious to entitle the defendant to a new trial. Rather, in every case in which a defendant has claimed that the prosecutor improperly asked him to characterize another witness' testimony as a lie, mistaken or wrong . . . it was the *cumulative* effect of the *Singh* violation and the other prosecutorial improprieties that ultimately was deemed to entitle the defendant to a new trial." (Emphasis added.) *State* v. *Jones*, 320 Conn. 22, 43–44, 128 A.3d 431 (2015).

For several reasons, we conclude that the defendant was not harmed by the court's ruling that permitted the state to cross-examine him on the veracity of Zolotov's testimony that Nunez and Jessica were standing idly prior to being struck by the defendant's vehicle. Importantly, the defendant's testimony did not implicate a core justification for the *Singh* rule because it did not force the jury to find him not guilty only if it first concluded that Zolotov had lied about what he had seen. In fact, the defendant ultimately rejected the notion that Zolotov had purposefully mischaracterized the event and, instead, testified that Zolotov had simply been mistaken. Thus, the jury could have concluded that the defendant was not guilty by crediting his version of the events—that Zolotov was merely mistaken—without concluding that Zolotov had intentionally lied.

Second, as a factual matter, there was little, if any, direct conflict between Zolotov's testimony and the defendant's testimony on the critical question regarding whether Nunez had engaged in any threatening conduct on the street corner giving rise to the defendant's right to exercise self-defense. As our Supreme Court has stated, "[i]t is axiomatic . . . that [if] . . . the jury is *not* required to resolve any such conflict, the harm that might otherwise ensue from such a question will be significantly reduced if not completely avoided." (Emphasis in original.) Id., 43. Zolotov conceded that his attention was diverted away from Nunez before the crash occurred because he had looked toward the defendant's vehicle. Indeed, defense counsel argued to the jury that Zolotov could not have "been watching Mr. Nunez and [Jessica] at the same time he was watching the red light, and at the same time he's watching [the defendant's] car." Thus, Zolotov's testimony was in large part consistent with the defendant's testimony that Zolotov may not have observed Nunez' allegedly threatening conduct because his attention had been diverted. Accordingly, any harm by the question was minimized if not avoided altogether.

Third, because Zolotov was a lay witness and not a law enforcement officer, the prosecutor's question did not implicate another core concern recognized by the *Singh* rule: "[T]he principal reason why a prosecutor may not ask a defendant about the truthfulness of an officer's contradictory testimony is to reduce the risk that the jury will resolve material conflicts between the

testimony of the defendant and the officer in favor of the state, out of a concern that to do otherwise would reflect adversely on the honesty of the officer." *State* v. *Jones*, supra, 320 Conn. 43.

Fourth, the court emphasized in its instructions that the jury remained the sole arbiter of any witness' testimony. Specifically, the court charged the jury that it "should size up the witness, then make your own judgment as to their credibility and decide what portion . . . all, some or none . . . of any particular . . . witness' testimony you will believe." We presume that the jury here followed the court's instructions, as nothing in the record indicates otherwise. *State* v. *Mucha*, 137 Conn. App. 173, 196, 47 A.3d 931, cert. denied, 307 Conn. 912, 53 A.3d 998 (2012).

Finally, the overall strength of the state's case leads us to conclude that any *Singh* violations were not harmful. The principal disputed issue in this case was not whether the defendant struck Nunez and Jessica with his vehicle, and then exited his vehicle and punched Nunez in the face. These facts were largely unchallenged and admitted in large measure by the defendant during his testimony. Instead, the disputed issue was whether the defendant's actions were justified because he properly acted in self-defense.

"It is well settled that a jury's evaluation of a claim of self-defense has both subjective and objective elements. . . . In evaluating a claim of self-defense, a trier of fact must first examine the danger that a defendant claims he faced. It is clear that here [t]he statute focuses on the [defendant] claiming self-defense. It focuses on what *he* reasonably believes under the circumstances . . . . The jury must view the situation from the perspective of the defendant. . . . The defendant's belief [however] ultimately must be found to be reasonable." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Peters*, 40 Conn. App. 805, 816, 673 A.2d 1158, cert. denied, 237 Conn. 925, 677 A.2d 949 (1996).

The state presented compelling evidence that the defendant sought out a confrontation with Nunez, expressed an intention to harm him, and then hunted him down on the street. The defendant's actions after striking Nunez and Jessica with his vehicle are strongly corroborative that he had intended to assault Nunez all along and was not acting in self-defense. From the defendant's conduct in exiting his vehicle and assaulting Nunez further, the jury was highly likely to conclude that the defendant's action in striking Nunez with his car was not in reaction to Nunez reaching for a weapon, which did not occur because Nunez was unarmed. If the defendant had truly acted in self-defense, there would have been no need to further attack Nunez, who lay seriously injured on the ground.

In light of these considerations, we conclude that the defendant has not met his burden to demonstrate that any *Singh* violations were harmful. Accordingly, we reject this claim.

B

The defendant next claims that the court improperly allowed the state to question him regarding his tattoos. Specifically, the defendant argues that evidence of his tattoos was irrelevant and that the probative value of it did not outweigh its prejudicial effect. Even if we assume, without deciding, that the court's ruling was improper, we conclude that the defendant has failed to demonstrate that he was harmed by the admission of the tattoo evidence.

The following additional facts are relevant to this claim. At trial, the defendant testified on direct examination that he drove his car into Nunez as an act of self-defense because he believed that Nunez would shoot him after he saw Nunez reach toward his waistband for what he believed was a gun. The defendant further testified that he believed Nunez possessed a firearm because he had seen a Facebook photograph of Nunez holding a firearm. Additionally, the defendant testified that he had learned from others that Nunez was a dangerous person. On cross-examination, the defendant admitted that he did not know whether the gun Nunez held in the Facebook photograph was real or not. Nonetheless, the defendant stated that he believed the gun depicted in the photograph was real on the basis of what he had learned about Nunez.

Following the defendant's testimony that he feared Nunez, the following colloquy occurred between the state and the defendant during its cross-examination of him:

"[The Prosecutor]: And you're a scaredy-cat; is that what your testimony is?

"[The Defendant]: Absolutely. I would be, I think being afraid of a gun is something human.

"[The Prosecutor]: Is [it true] that you have tattoos all over your body, sir?

"[Defense Counsel]: Objection, Your Honor.

"[The Prosecutor]: Sidebar?

"(The court and counsel conferred at the sidebar.)

"[The Prosecutor]: May I continue, Your Honor?

"The Court: Yes, the objection is overruled in part and sustained in part . . . per the instructions at sidebar. . . .

"[The Prosecutor]: Isn't it true, sir, you have a tattoo around your collarbone that says, Let him hate so long as they fear?

"[The Defendant]: Yes, I do.

"[The Prosecutor]: And isn't it true, sir, you have a tattoo on your arm, [that says], hate, love and love, hate, with a skull in the middle?

"[The Defendant]: Yes, a skull with a cross."

The court later clarified, outside the presence of the jury, its ruling relating to the objection made by the defendant. The court stated in relevant part: "[T]here was an objection to—I believe the first objections and first sidebar related to the tattoos, the state's wanting to introduce evidence of the tattoos. I looked at . . . the booking pictures of the tattoos. The state indicated at sidebar that it was not going to introduce the actual booking photos, but that it would ask the defendant if he had these tattoos, and if he denied it then they would seek to introduce the booking photos. There were several tattoos and the state's claim was that . . . they were relevant, that the defendant had opened the door based on his testimony that he was fearful, and that he had done research relating to the . . . alleged victim, and in response to the questions on direct as well as . . . leaving the jury with the impression that he was a—well, these were the state's words, not the court's— a scaredy-cat. The court indicated [at sidebar] that it was relevant, given the line of questioning. The objection . . . was that they were prejudicial and not relevant. The court ruled that it would allow only three of the tattoos—the ones that related to hate, love, love, hate, and, let them hate [so] long as they fear. That went to whether this defendant reasonably was fearful for his life under the circumstances as this case unfolded."

As a preliminary matter, we note that the state conceded at oral argument before this court that, had the defendant not "opened the door" to his character by agreeing with the prosecutor that he was a "scaredy-cat," evidence of the defendant's tattoos would have been otherwise inadmissible.

Under the doctrine of opening the door, evidence that otherwise would be inadmissible is admissible for the limited purpose of rebutting testimony once the witness "opened the door . . . ." *State* v. *Brown*, 309 Conn. 469, 479, 72 A.3d 48 (2013). In essence, the underlying purpose of the doctrine of opening the door is to prevent a defendant from introducing irrefutable, self-serving evidence.[10] Id. Although we have serious doubts that the defendant "opened the door" to this evidence regarding his character by agreeing that he was a "scaredy-cat" in response to the state's single, sarcastic question on cross-examination about guns, we need not decide whether the court's ruling was improper because, even if it was, the defendant has failed to persuade us that this evidence substantially swayed the jury's verdict.

The legal principles we rely upon in determining whether an erroneous evidentiary ruling is harmless are set forth in part II A of this opinion. See *State* v. *Calabrese*, supra, 279 Conn. 411–12. After reviewing the entire record, we conclude for several reasons that the tattoo evidence was unlikely to have substantially swayed the jury's verdict.

First, as we discussed in analyzing the defendant's other evidentiary claim, the state's case was strong, including its tendency to disprove the defendant's claim of self-defense. The evidence presented to the jury strongly supported the state's claim that the defendant sought out a confrontation with Nunez, motivated by the defendant's strong animosity and conflict with Jessica and other members of her family, and Nunez' relationship with them. The defendant expressed an intention to harm Nunez and then hunted him down on the street as the initial aggressor. The defendant's subjective lack of fear of Nunez was primarily established, not by the defendant's vague pronouncements on his tattoos, but in part by the evidence that showed that the defendant did not exhibit any fear of Nunez when he initially drove by him and sent him a Facebook message asking, "[w]hat are you doing out in the open? I like to get away with crime."

The state's evidence disproving the objective reasonableness of any subjective fear the defendant allegedly may have had, even if he actually saw Nunez reaching toward his waist, was also strong. The jury properly was instructed that "before a defendant uses physical force upon another person to defend himself, he must have two reasonable beliefs. . . . [T]he first is a reasonable belief that physical force is about to be used upon him. The second is a reasonable belief that the degree of force he is using to defend himself from what he believes to be an imminent force is necessary for that purpose."

The defendant conceded that he never saw Nunez display a gun and that he merely saw him reaching into his coat. Even if the jury believed the defendant's testimony that he previously had seen a photograph of Nunez holding a firearm, the jury was likely to conclude that it was not objectively reasonable to believe that Nunez was about to shoot at him without, at the least, actually seeing a gun. Moreover, at the time he claims he saw Nunez reaching into his coat, the defendant was in the relative safety of his moving vehicle and had ample opportunity to steer his vehicle away from Nunez. Thus, the evidence strongly suggested that the defendant's belief that he must use deadly force was objectively unreasonable. The tattoo evidence had little or no bearing on the questions.

Second, we disagree with the defendant's contention that the tattoo evidence was so unduly prejudicial that

it substantially swayed the jury's verdict. Specifically, the defendant contends that the evidence of the tattoos was unduly prejudicial because jurors were likely to conclude that because he has tattoos, he is a bad person and is likely to have a propensity to engage in criminal behavior. We are not persuaded.

Evidence is unduly prejudicial if, among other things, it may "unduly arouse the [jurors'] emotions, hostility or sympathy . . . ." (Internal quotation marks omitted.) *State* v. *Hill*, 307 Conn. 689, 698, 59 A.3d 196 (2013). In this regard, we note that the defendant never asked the court to give the jury a limiting instruction to reduce the risk that the jury would misuse the evidence as tending to show his general propensity to engage in criminal conduct.

Tattoos have become ubiquitous in modern society, and acceptance of tattoos by those who do not have one has risen substantially.[11] Numerous courts have upheld the admission of tattoo evidence after weighing the probative value of the evidence versus its prejudicial effects; see, e.g., *United States* v. *Boswell*, 772 F.3d 469, 476–78 (7th Cir. 2014) (tattoo of revolver on defendant's neck), cert. denied,      U.S.     , 135 S. Ct. 1721, 191 L. Ed. 2d 690 (2015); or concluded that, even if tattoo evidence was improperly admitted, its admission was not so prejudicial as to warrant a new trial. See, e.g., *United States* v. *Smith*, 348 Fed. Appx. 636, 638–39 (2d Cir. 2009) (harmless error to admit tattoo depicting the "skull, arms, and ribcage of a skeleton firing a weapon, with shell cases being ejected from the gun, flame coming out of the barrel, and the words 'D'EVILS WITHIN' printed above"), cert. denied, 559 U.S. 930, 130 S. Ct. 1310, 175 L. Ed. 2d 1106 (2010); *United States* v. *Newsom*, 452 F.3d 593, 603–605 (6th Cir. 2006) (harmless error to admit evidence of defendant's tattoos depicting guns and referencing " 'thug life' ").[12]

The defendant cites, and our research has found, only one case in which an appellate court has concluded that improperly admitted tattoo evidence was so prejudicial that it warranted a new trial. See *United States* v. *Thomas*, 321 F.3d 627, 637 (7th Cir. 2003). *Thomas*, however, is distinguishable on several grounds.

The defendant in *Thomas* was convicted of possession of a firearm by a convicted felon and simple possession of crack cocaine, on the basis of testimony by an eyewitness that the defendant pointed a gun at her and later threw the weapon in some nearby bushes. Id., 629–30. At trial, the court improperly admitted (1) a photograph of a tattoo on the defendant's arm depicting two crossed revolvers and (2) evidence of the fact that the defendant had twice been convicted of illegal possession of a firearm. Id., 635.

On appeal, the United States Court of Appeals for the Seventh Circuit concluded that the erroneous

admission of the tattoo evidence and the convictions were not harmless error. Id., 637. In reaching that conclusion, the court stressed that the government's case was weak because it relied upon a theory of constructive possession of the firearm in light of the fact that the weapon was not found in the defendant's possession. Id., 636. More importantly, the court relied on the risk that the gun tattoo evidence would be misused by the jury as direct evidence of the defendant's propensity to possess firearms, rather than as a mere propensity to engage in bad acts generally. Id., 632. In combination with the improperly admitted prior gun possession convictions, the court concluded that the risk that the jury used the evidence for the improper purpose of finding that the defendant's propensity to possess firearms was high and that admission of that evidence was harmful.[13] Id., 636. Finally, we note that, unlike the situation in the present case, the burden was on the government to prove that the evidentiary errors were harmless. Id., 635; see Fed. R. Crim. P. 52 (a).

In the present case, the defendant's tattoos did not relate directly to the specific crimes with which he was charged. Thus, the risk is more attenuated in this case than in *Thomas* that the jury misused the tattoo evidence as evidence of a propensity to engage in the specific crimes of assault and reckless endangerment. With this understanding, and in light of the overall strength of the state's evidence in the present case and the differing burdens of persuasion with respect to harmful error, we decline to follow the reasoning in *Thomas*.

In conclusion, the defendant's tattoos were not a central part of the state's case, and admission of that evidence alone could not have substantially swayed the jury's decision. Cf. *State* v. *Calabrese*, supra, 279 Conn. 411–12. Independent of the tattoo evidence, the state presented strong evidence demonstrating that the defendant had set out to attack Nunez and tending to disprove the defendant's asserted claim of self-defense by showing that he did not subjectively fear Nunez and that any fear the defendant may have had was objectively unreasonable. Accordingly, even if we assume the tattoo evidence was admitted improperly into evidence, the defendant has failed to persuade us that any error was harmful.

### III

The defendant next claims that the trial court improperly instructed the jury regarding his duty to retreat. Specifically, the defendant argues that the court's charge was improper because it instructed the jury to determine whether his knowledge or belief that he could not retreat in complete safety was objectively reasonable. The defendant acknowledges that his claim is unpreserved and seeks to prevail pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989);

see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third condition of *Golding*); or, in the alternative, the plain error doctrine. See Practice Book § 60-5.

The state concedes that the court's instruction was improper because it "failed to properly apprise the jurors of the subjective component of the duty to retreat test." The state, however, argues that the defendant waived his challenge to the court's instructions under *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011), and thus is not entitled to *Golding* or plain error review. We agree with the state that the defendant cannot prevail on this claim.

The following procedural history is relevant to our resolution of this claim. On January 29, 2014, the court provided both parties a draft of its proposed jury instructions, which contained the court's instruction on the duty to retreat. The following day, the court held a charging conference on the record and solicited comments from the parties after it extensively reviewed the instructions with the parties.

During the charging conference, the court directed the parties to the section of the written instructions that contained the challenged duty to retreat instructions and asked the parties whether they had any comments or objections.[14] The defendant did not object or suggest any changes to the court's instructions. Similarly, the defendant did not object to the instructions when the challenged language was read to the jury.

Our Supreme Court concluded in *Kitchens* that "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." Id. Recently, in *State* v. *Bellamy*, 323 Conn. 400, 439, 147 A.3d 655 (2016), our Supreme Court declined to overturn the rule that unpreserved instructional claims are waived under *Kitchens*. See also *State* v. *Herring*, 323 Conn. 526, 528, 147 A.3d 653 (2016).

Here, the court furnished to the parties a copy of its draft of the proposed jury charge, which included the challenged language, one day in advance of the charging conference and, thus, provided the defendant a meaningful opportunity to review it. The defendant also did not submit a request to charge on this topic. Furthermore, prior to closing arguments, the court held a charging conference at which the court reviewed the proposed charge page by page and solicited comments and objections from both parties. The defendant raised no objection to the charge. The defendant also did not

object when the court gave the charge to the jury. In our view, the defendant had ample opportunity to object to the challenged duty to retreat instruction but did not. Accordingly, the defendant waived his instructional claim under *Kitchens* and, thus, cannot prevail under *Golding*.[15]

Alternatively, the defendant requests that this court review his unpreserved claim under the plain error doctrine. A party may prevail under the doctrine of plain error only in "truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Thus, in addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . In *State* v. *Fagan*, [280 Conn. 69, 87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007)], we described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Myers*, 290 Conn. 278, 287–88, 963 A.2d 11 (2009).

Our Supreme Court has recently recognized that "there appears to be some tension in our appellate case law as to whether reversal on the basis of plain error could be available in cases where the alleged error is causally connected to the defendant's own behavior. In *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 70, 967 A.2d 41 (2009), this court held that where the defendant, personally and through counsel, had expressly waived his right to trial, reversal for plain error was not appropriate because if there has been a valid waiver, there is no error for us to correct. . . . In other cases, this court has addressed a claim of plain error despite a finding of waiver or induced error, but nonetheless has relied in part on the defendant's action as a basis for concluding that the defendant had not demonstrated the manifest injustice or prejudice required to prevail under the plain error doctrine." (Citation omitted; internal quotation marks omitted.) *State* v. *Darryl W.*, 303 Conn. 353, 371–72 n.17, 33 A.3d 239 (2012); see also *State* v. *Kitchens*, supra, 299 Conn. 474 n.18 ("a valid waiver precludes a finding that a jury instruction constitutes plain error because a valid waiver means that there is no error to correct"); *State* v. *Bialowas*, 160 Conn. App. 417, 430, 125 A.3d 642 (2015) ("waiver thwarts a finding that plain error exists").

In *Bellamy*, our Supreme Court did not resolve the question of whether waiver under *Kitchens* precludes relief under the plain error doctrine: "We . . . decline to address the parties' arguments regarding the effect of *Kitchens* on plain error review because it is the subject of a pending appeal before this court. See *State* v. *McClain*, 319 Conn. 902, 122 A.3d 637 (2015) (granting certification to review issue of whether 'the Appellate Court properly determine[d] that an implied waiver of a claim of instructional error that satisfies [*Kitchens*] also forecloses plain error review' [citation omitted])." *State* v. *Bellamy*, supra, 323 Conn. 433 n.22.

Nevertheless, even if we were to assume, without deciding, that the defendant's waiver under *Kitchens* would not preclude him from prevailing under the plain error doctrine, we conclude that the defendant cannot demonstrate that the claimed instructional error was "so clear, obvious and indisputable to warrant the extraordinary remedy of reversal." See *State* v. *Elias V.*, 168 Conn. App. 321, 338, 147 A.3d 1102 (concluding, but not deciding, that even if the defendant's waiver under *Kitchens* would not preclude him from seeking relief under the plain error doctrine, the claimed error did not warrant reversal), cert. denied, 323 Conn. 938, A.3d (2016).

Our Supreme Court held in *State* v. *Ash*, 231 Conn. 484, 492, 651 A.2d 247 (1994), that General Statutes § 53a-19 (b), which governs the duty to retreat, requires the finder of fact, in deciding whether the state had disproven self-defense beyond a reasonable doubt, to ascertain whether the defendant had actual knowledge regarding his ability to retreat in complete safety. In other words, the duty to retreat contains a subjective component. Id.; see also *State* v. *Amado*, 254 Conn. 184, 194, 756 A.2d 274 (2000); *State* v. *Montanez*, 71 Conn. App. 246, 263, 801 A.2d 868, cert. denied, 261 Conn. 935, 806 A.2d 1069 (2002).

Here, the initial portion of the court's instructions stated properly that the state must prove that the defendant "knows that he can avoid the necessity of using [deadly physical] force with complete safety by retreating." The court repeated this requirement a second time. In defining the concept of knowledge, the court made clear that it was referring to actual knowledge by stating that a "person acts knowingly with respect to a circumstance . . . *when he is aware that such circumstance exists*." (Emphasis added.) Thus, the court's instructions, at least initially, appropriately informed the jury of the necessity to consider the subjective belief of the defendant, that is, whether he had actual knowledge that he could retreat in complete safety.

Later in the instruction, however, the court may have muddied the waters somewhat with respect to the

knowledge component of the duty to retreat when it attempted to explain to the jury that such knowledge is typically established only "through an inference from other proven facts and circumstances." In attempting to explain that any such inferences that may be drawn must be reasonable, the court stated: "The inference may be drawn if the circumstances are such that a reasonable person of honest intention in the situation of the defendant would have concluded that one could avoid the necessity of using deadly force by making that completely safe retreat."

We agree with both the defendant and the state that this sentence, like portions of the instructions in *Ash*, risked diluting the jury's understanding of the need to ascertain whether the defendant had actual knowledge that he could retreat in complete safety. If this claim of instructional error had been properly preserved at trial, we would then proceed to analyze whether, in light of the court's entire instructions and the evidence presented to the jury, it was reasonably possible that the jury was misled by the inclusion of this single sentence.[16] In our view, such a claim would present a close question.

Importantly, however, this instructional error was not preserved at trial and, in fact, was waived pursuant to *Kitchens*. Instead, application of the plain error doctrine requires us to ask whether any error by the court was " 'so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal' " because it would result in manifest injustice. *State* v. *Darryl W.*, supra, 303 Conn. 373. Because it is a close question whether the court's instructions misled the jury in this case, we conclude that the defendant has fallen far short of his burden to establish that he is entitled to relief pursuant to the plain error doctrine.[17]

IV

The defendant next claims that the state deprived him of due process by committing various acts of prosecutorial impropriety. In particular, the defendant contends that the prosecutor improperly (1) asked the defendant to comment on Zolotov's credibility and relied upon his answers in closing arguments, (2) compared the defendant's actions to those of a mentally ill person, (3) repeatedly used the phrase "hunting mission" to describe the defendant's actions, (4) mischaracterized the defendant's testimony, and (5) relied upon and misused the defendant's tattoo evidence. We address each in turn.

We begin our review of the defendant's claim by setting forth the applicable standard of review and guiding legal principles. "In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether

that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair . . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted.) *State* v. *Gould*, 290 Conn. 70, 77–78, 961 A.2d 975 (2009). "Accordingly, it is not the prosecutorial improprieties themselves but, rather, the nature and extent of the prejudice resulting therefrom that determines whether a defendant is entitled to a new trial." *State* v. *Jones*, supra, 320 Conn. 34–35.

"To determine whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams* [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that misconduct was objected to at trial. . . . These factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Devito*, 159 Conn. App. 560, 573, 124 A.3d 14, cert. denied, 319 Conn. 947, 125 A.3d 1012 (2015).

### A

The defendant first argues that the prosecutor committed impropriety by cross-examining the defendant regarding Zolotov's credibility and later referring to that testimony during closing argument. We agree, for the reasons stated in part II A of this opinion, that the prosecutor committed an impropriety by asking the defendant to comment about the veracity of another witness' testimony in violation of rule set forth in *State* v. *Singh*, supra, 259 Conn. 706. We, however, conclude that because the court permitted the state to pursue this line of inquiry, the prosecutor did not commit an impropriety by referring to the defendant's answers during closing argument.[18]

Our Supreme Court has held that "[a]rguing on the basis of evidence explicitly admitted . . . cannot constitute prosecutorial [impropriety]." *State* v. *Rowe*, 279 Conn. 139, 152, 900 A.2d 1276 (2006). "[O]nce the testimony [at issue] was in evidence, the prosecutor [is] permitted to use it during [closing] argument . . . ." (Citation omitted.) *State* v. *Cromety*, 102 Conn. App. 425, 434, 925 A.2d 1133, cert. denied, 284 Conn. 913,

931 A.2d 932 (2007); see also *State* v. *Devito*, supra, 159 Conn. App. 575. The court here admitted the defendant's testimony into evidence, thus, the prosecutor was entitled to rely upon the court's ruling and discuss the evidence in her closing argument.

Furthermore, the prosecutor's closing argument also did not in any way mischaracterize the defendant's testimony or otherwise use his testimony in an improper way. See *State* v. *Otto*, 305 Conn. 51, 76–81, 43 A.3d 629 (2012). During its closing argument, the state's only reference to the defendant's opinion regarding Zolotov's testimony was to convey to the jury that Zolotov remained a credible witness. The state sought to explain to the jury that the defendant's assertion that Zolotov was somehow an unreliable witness was implausible. Accordingly, the prosecutor's comments during closing argument regarding the defendant's opinion of Zolotov's credibility does not constitute impropriety.

B

The defendant next argues that the prosecutor improperly attacked his competency during the state's closing argument. Specifically, the defendant argues that the state impermissibly characterized his actions as "akin to that of a mentally ill person . . . ." We disagree.

During the state's closing argument, the prosecutor made several statements in an attempt to disprove that the defendant was reasonably fearful with respect to his asserted claim of self-defense. The defendant claims that the following constituted prosecutorial impropriety: "[The defendant] told you he believed that his life was in imminent danger at the moment he saw Edwin Nunez flagging him down on the corner. And let's pretend for a moment that for whatever reason, you've decided that . . . he really believed that. . . . Was that a reasonable, rational belief? . . . And the state would argue to you it never could have been. Therefore you must reject . . . his claim of [self-defense], and here's why. We don't live in the wild west, ladies and gentlemen. . . . This isn't TV; this is the real world and we have real laws. And we have real expectations of safety as the citizens of the state. And perhaps I am wrong, perhaps you believe it is reasonable that one text message sent to you two days prior should give you the right . . . to go on some paranoid investigation, some irrational investigation, leading to some irrational belief that now this person is trying to kill you, with no other evidence than one text message."

The prosecutor later argued that "[t]here's no evidence that the police were out to get [the defendant]. So, again, if the . . . law were to excuse the conduct of the defendant, then this is what the law would be saying. Or it would be saying that, you know, it might be a paranoid delusion, it might be irrational, but as

long as you thought your life was in danger, you go ahead and you take your car and you run down whoever you think is trying to get you. . . . [N]o one can deny that after he hit him with the car, the defendant got out and beat up Edwin Nunez. This person that he's so afraid of, he goes over to him and beats him up. Is that self-defense? When you're kicking the guy on the ground with a broken arm and a broken leg, is that self-defense? No. Afraid he's going to shoot him through the car, like some video game? Again, it has to be a reasonable and rational belief. . . . You could believe it all day, if you want, that your life was in danger, but if it was an irrational belief, if it was an unreasonable belief, the law does not excuse it. The law does not allow us to act as [irrational] people, committing random acts of violence because we have some paranoid, irrational belief that it's necessary to protect ourselves, necessary to put all these other people's lives in danger."

We disagree with the defendant's assertion that the prosecutor attacked his "competency" or suggested that he is mentally ill by describing the defendant as "paranoid," "delusion[al]," and "irrational," during the state's closing argument. "[A]s the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State* v. *Otto*, supra, 305 Conn. 76. Our law is well settled that "[the prosecutor's] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. . . . That is not to say, however, that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . The state's attorney should not be put in [a] rhetorical straitjacket . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 435, 64 A.3d 91 (2013).

When read in the context of this case, the state used those words as a rhetorical device to assert that the defendant's conduct, at best, was undertaken in response to an unreasonable fear that his life was in danger. Simply put, the state conveyed to the jury that its position, with respect to the defendant's asserted claim of self-defense, was that his belief was unreasonable.

The prosecutor supported that position by explaining to the jury that a claim of self-defense does not excuse acts of violence in response to an "irrational" or "delu-

sion[al]" subjective fear of danger. Nothing in the state's closing argument or the record suggests that the prosecutor attacked the defendant's mental competency, but instead the prosecutor described the importance of the requirement that a defendant's action must be reasonable when acting in self-defense. Importantly, the prosecutor did not improperly divert the jury from the facts in evidence, but instead focused the jury's attention on a hotly disputed question of fact. Accordingly, the prosecutor's statements were not improper.

C

Next, the defendant argues that the prosecutor committed impropriety when she used the phrase "hunting mission" twice to describe the defendant's conduct. He further argues that the prosecutor's use of that phrase improperly connected gun violence caused by mental illness. We disagree.

The challenged statements by the prosecutor argued are: "Now, the state would argue that if you look at all the evidence in the case, this was a hunting mission. . . . In this case, the way the law of self-defense works, is, even if you buy that the defendant was not on a hunting mission. . . . Even if you believe that at that moment the defendant honestly believed that he was in fear for his life, was that belief reasonable . . . [?]"

As noted in the foregoing, "a prosecutor may argue the state's case forcefully" so long as that argument is fair and based on facts in evidence and the reasonable inferences to be drawn therefrom. *State* v. *Otto*, supra, 305 Conn. 76. "Although a state's attorney may argue that the evidence proves the defendant guilty, he may not stigmatize the defendant by the use of epithets which characterize him as guilty before an adjudication of guilt." *State* v. *Williams*, supra, 204 Conn. 545–46. On the basis of our review of the record, the prosecutor's use of the phrase "hunting mission" was reasonably based upon evidence presented at trial.

Part of the state's theory at trial was that the defendant had used social media to stoke an ongoing conflict with Nunez, arranged to confront Nunez on the street and then intentionally assaulted him by driving a vehicle into him. In an effort to persuade the jury of the defendant's conscious objective to physically harm Nunez, the prosecutor described his conduct as a "hunting mission." In our view, describing the defendant's overall course of conduct as a "hunting mission" was a reasonable rhetorical device and was based upon the evidence.[19] We also simply do not understand how the state's use of the phrase "hunting mission" created an improper connection between gun violence and mental illness. The state drew no such connection, and the use of the phrase, "hunting," does not necessarily invoke gun violence, particularly here, where a gun was not used by anyone. Accordingly, we conclude that the

state's use of the phrase "hunting mission" did not constitute impropriety.

## D

The defendant next argues that the prosecutor mischaracterized the defendant's testimony during the state's closing argument. Specifically, he argues that the prosecutor committed impropriety when she stated that he testified that he "was reasonably in fear of imminent harm." We disagree that the prosecutor's remark was improper.

The prosecutor's statement, in context was: "[I]f motivation is a basis for incredibility, ladies and gentlemen, who's more motivated than the defendant, who, by the way, is the only witness [who] sat here and listened to all the evidence and testified last, after he got to hear everybody's story? So, what does that tell you about how he crafted the testimony that he crafted, using, interestingly enough, legal terms during his testimony. *I was reasonably in fear of imminent harm. Something like that.* There's nothing wrong with that; I'm just saying . . . if we're judging credibility on how a person testifies, their demeanor during their testimony, what they say, as the defense has asked you to do with [Nunez] . . . what's good for the goose is good for the gander." (Emphasis added.)

It is well established that "[a] prosecutor . . . may not . . . inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence. . . . A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Moore*, 293 Conn. 781, 809, 981 A.2d 1030 (2009), cert. denied, 560 U.S. 954, 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010).

We conclude that the prosecutor did not mischaracterize, at least in any intentional or substantial sense, the defendant's testimony. During the state's closing argument, the prosecutor argued that the defendant testified that he "was reasonably in fear of imminent harm . . . [s]*omething like that.*" (Emphasis added.) Although the defendant actually testified that he "went in [Nunez'] direction in fear for my life," the prosecutor's use of the qualifier, "something like that," when recounting that testimony makes clear she was not attempting to mislead the jury into believing that those were the precise words used by the defendant in his testimony. Moreover, the state began its closing argument with an admonition to the jury that it is the jury's recollection of the evidence that controls, not the state's recollection that matters.

Finally, it is important to remember that, although the prosecutor could have expressed herself with greater precision, we cannot say that her argument constituted impropriety, particularly in light of her qualifying remark. "[W]e are mindful . . . that closing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear." (Internal quotation marks omitted.) *State* v. *Williams*, 102 Conn. App. 168, 197, 926 A.2d 7, cert. denied, 284 Conn. 906, 931 A.2d 267 (2007).

Instead, the prosecutor's primary point, in context, was to suggest that the defendant had witnessed the prior testimony admitted throughout the trial before he testified and that he had the opportunity to conform his testimony to the evidence and the law. The challenged statement, at its heart, was not intended to persuade the jury to accept facts not in evidence, but instead sought to attack the motivations of the defendant to craft his testimony in a self-serving manner. Thus, the prosecutor's statements during closing argument were not improper.

E

Finally, the defendant argues that the prosecutor improperly used and misused the defendant's tattoo evidence. We disagree.

Notwithstanding our assumption in part II B of this opinion that the court improperly admitted the defendant's tattoo evidence, we repeat that "[a]rguing on the basis of evidence explicitly admitted . . . cannot constitute prosecutorial [impropriety]." *State* v. *Rowe*, supra, 279 Conn. 152. Accordingly, we conclude that the prosecutor's reference in closing argument to the admitted tattoo evidence was not improper.

F

We briefly turn then to the question of whether the sole instance of prosecutorial impropriety identified in this case, specifically, the prosecutor's questions asking the defendant to opine on the credibility of another witness, deprived the defendant of a fair trial. In part II A of this opinion, we concluded that the trial court's improper evidentiary ruling permitting this inquiry did not constitute harmful error for a multitude of reasons. Those same reasons are applicable here with respect to the defendant's claim of prosecutorial impropriety and we need not repeat them.

The judgment is affirmed.[20]

In this opinion the other judges concurred.

[1] The court sentenced the defendant to a total effective term of imprisonment of twenty years, execution suspended after fourteen years, and five years of probation.

[2] The jury was instructed on counts one and two to consider certain lesser included offenses if it found the defendant not guilty on either count.

[3] On the day of the assault, Zolotov was in his vehicle while stopped at

a red traffic signal located near the area where the defendant drove his vehicle into Nunez and Jessica.

[4] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (1) [w]ith intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[5] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, the actor causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm . . . ."

We note that although § 53a-60 has been amended since the events at issue in this appeal, those amendments are not relevant here. We therefore refer to the current revision of § 53a-60 as codified in the 2016 supplement to the General Statutes.

[6] Prior to closing arguments on January 30, 2014, the court gave the parties an opportunity to read the proposed jury instructions. The court proceeded to review the entire proposed jury instructions page by page. For each of the challenged counts—counts one, two, and four—defense counsel raised no objection.

[7] The prosecutor further stated that "[r]eckless endangerment is merely [that the defendant] did an act that was so out of the ordinary, with extreme indifference to human life, that by [his] actions [the defendant] had absolutely no regard for the safety of the persons involved." The prosecutor argued that "the actions of [the defendant] constituted an extreme indifference to human life, with reckless disregard for whether or not he could cause serious physical injury to either [McDougall], [Jessica] or [Nunez]."

[8] It is not unusual or an unwise practice for the state to file, close to the time of trial, a substituted information reducing the number of offenses charged or changing the particular crimes charged because the prosecutor who is assigned to try the case has done a substantial amount of trial preparation and has a more precise grasp of the evidence that the state intends to offer at trial.

[9] We note that the defendant objected to the first question, but did not object to the subsequent questions, including the most objectionable question, which asked him whether Zolotov had intentionally mischaracterized the evidence. Our Supreme Court has held that an objection to a question does not relieve a party from the obligation to object to similar subsequent questions; *Sears* v. *Curtis*, 147 Conn. 311, 313, 160 A.2d 742 (1960); unless the court has granted a continuing or running objection to that line of inquiry; *Putnam, Coffin & Burr, Inc.* v. *Halpern*, 154 Conn. 507, 512–13, 227 A.2d 83 (1967); or unless the prior ruling indicated that later objections would be futile. Cf. *State* v. *Spencer*, 198 Conn. 506, 512, 503 A.2d 1165 (1986). Any appellate claim arising from the subsequent questions, therefore, arguably is unpreserved. The state, however, does not argue that we should decline to review this claim, and we elect to do so in light of our ultimate conclusion that the defendant has not demonstrated the harmfulness of any error.

[10] "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . This rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context. . . . The doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. . . . Thus, in making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 309 Conn. 479.

[11] In support of this assertion, we take judicial notice of a recent Harris poll that reveals that 29 percent of adults in the United States have at least

one tattoo, and 69 percent of those individuals have two or more tattoos. See The Harris Poll, "The Harris Poll #12, February 10, 2016," (last modified February 10, 2016), available at http://www.theharrispoll.com/health-and-life/Tattoo_Takeover.html (last visited February 17, 2017) (copy contained in the file of this case in the Appellate Court clerk's office); see also *State* v. *Santiago*, 318 Conn. 1, 127, 122 A.3d 1 (appellate courts permitted to take notice of extra-record materials, including scientific and sociological studies). Less than half of the surveyed individuals who do not have a tattoo believe that those with tattoos are "more rebellious." The Harris Poll, supra.

[12] See also *United States* v. *Quintero*, 1991 U.S. App. LEXIS 10446, *8 (9th Cir. May 15, 1991) ("[w]e do not believe that all tattoos, as a general matter, create juror prejudice sufficient to violate a defendant's right to a fair trial") (decision without published opinion, 933 F.2d 1017 [9th Cir. 1991]).

[13] We also note that *Thomas* was decided in 2003, when negative societal attitudes about tattoos may have been more prevalent.

[14] The challenged duty to retreat instruction provides in relevant part: "A person is not justified in using deadly force upon another person if he knows that he can avoid the necessity of using such force with complete safety by retreating. This disqualification requires the defendant to retreat instead of using deadly force whenever two conditions are met. One, a completely safe retreat is in fact available to him, and, two, he knows that he can avoid the necessity of using deadly physical force by making that completely safe retreat. . . . The term complete safety as used in [the] statute [that governs the duty to retreat, General Statutes § 53a-19] means, without any injury to the defendant whatever. A person acts knowingly with respect to a circumstance described in a statute when he is aware that such circumstance exists. . . . Ordinarily, knowledge can be established only through an inference from other proven facts and circumstances. *The inference may be drawn if the circumstances are such that a reasonable person of honest intention in the situation of the defendant would have concluded that one could avoid the necessity of using deadly physical force by making that completely safe retreat.* The determinative question is whether the circumstances in the particular case form a basis for a sound inference as to the knowledge of the defendant in the circumstances under inquiry." (Emphasis added.)

[15] "Under *Golding*, a defendant may prevail on an unpreserved claim only if the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Wright*, 319 Conn. 684, 688, 127 A.3d 147 (2015). "[T]he first two [prongs of *Golding*] involve a determination [as to] whether the claim is reviewable; the second two . . . involve a determination [as to] whether the defendant may prevail." (Internal quotation marks omitted.) *State* v. *LaBrec*, 270 Conn. 548, 555, 854 A.2d 1 (2004).

Although the record is adequate to review and the defendant claims he was deprived of his constitutional right of due process, he cannot prevail under *Golding*. "[A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . ." (Internal quotation marks omitted.) *State* v. *Kitchens*, supra, 299 Conn. 467. Thus, in light of the defendant's waiver under *Kitchens*, the defendant cannot prevail under *Golding*.

[16] The claim of instructional error in *State* v. *Ash*, 33 Conn. App. 782, 795, 638 A.2d 633, rev'd on other grounds, 231 Conn. 484, 651 A.2d 247 (1994), had been preserved by the defendant "by filing a proper request to charge with respect to the issue of self-defense . . . ."

[17] The defendant also requests that this court grant him relief on this issue through an exercise of its supervisory power over the administration of justice. "Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) *State* v. *Elson*, supra, 311 Conn. 764–65. The circumstances of this case are not sufficiently serious to warrant exercise of our supervisory powers, and, thus, we decline the defendant's request.

[18] During the state's closing argument, the prosecutor argued in relevant part: "Edwin Nunez did not flag anybody down because Jan Zolotov would

have seen it. And the defendant's theory that Jan Zolotov looked away and never saw Edwin Nunez flagging him down makes no sense because Jan Zolotov said he didn't look away, he just noticed a car speeding. Until he noticed a car speeding, he saw the people on the corner. And if you are to listen to the way the defendant tells you the story, he didn't speed up until he was flagged by Edwin Nunez. Do you understand what I am saying? So, that chronology, that flow, those two sets of facts have to be reconciled by you, the jury."

The prosecutor later argued: "If you can find evidence in this case, a reason, to say that Jan Zolotov was an incomplete fact witness because he did not have a good look at this particular incident, I challenge you to make that decision based on the evidence or lack of evidence in the case. How the defendant has characterized Jan Zolotov as an unreliable eyewitness . . . it's pulled out of the air, it's speculation."

[19] Even if it were improper, the phrase was only used twice and "does not rise to the level of continuous use of invective [that] would have the improper effect of appealing to the emotions and prejudices of the jurors." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 616, 65 A.3d 503 (2013).

[20] We note that the defendant requests, in the alternative, that this court exercise its supervisory power over the administration of justice to reverse his conviction on the basis of a pattern of prosecutorial impropriety by this prosecutor. In light of our preceding resolution of the alleged improprieties, we decline the defendant's request to exercise our supervisory power. Accordingly, we decline to reverse the defendant's conviction.